Herbert H. Nelson and Elizabeth Eby Nelson v. Commissioner.
Nelson v. Commissioner
Docket No. 3735-65.
United States Tax Court
T.C. Memo 1968-35; 1968 Tax Ct. Memo LEXIS 264; 27 T.C.M. (CCH) 158; T.C.M. (RIA) 68035; February 27, 1968. Filed *264 Held: (1) A loss of pine trees on petitioners' residential property due to mass attack by southern pine beetles was a loss by casualty within the meaning of section 165(c)(3), I.R.C. 1954. Elton S. Lipnick, for the petitioners. Thomas S. Loop, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in income tax of petitioners for the calendar year 1962 in the amount of $1,990.37. The sole issues for decision are whether damage to petitioners' property caused by the southern pine beetle constituted a loss by casualty, within the meaning of section 165(c)(3) of the Internal Revenue Code *265 of 1954, and, if so, what was the amount of such loss. Findings of Fact The stipulation of facts and the exhibits attached thereto are incorporated by reference. The petitioners are husband and wife. At all relevant times they resided in Dickinson, Texas. They filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue at Austin, Texas. In 1952 the petitioners acquired a tract of land of approximately four acres wooded with pine trees of the loblolly species. They acquired an additional tract of some two acres in 1957. They improved this property with a one-story frame residence of 2,000 square feet with attached two-car garage and workroom, a large brick patio, water lily pond and garden. The property has Bayou frontage and is wire fenced on the other sides. In 1962 the trees on the property included 48 loblolly pines, more than 50 feet tall. Immediately to the east of petitioners' property was an area known as the Ervine-Bishop tract. A portion of some 30 acres of this tract was heavily wooded with towering native yellow-pine timber. In July 1962 Elizabeth Eby Nelson noticed that the crown, or upper areas of some of *266 the loblolly pine trees on the petitioners' property had changed color. She called the county agent, who examined the trees. He informed her that the trees were attacked by southern pine beetles and recommended spray to protect the trees. The petitioners 159 had the trees sprayed but 24 of their 48 loblolly pines were killed. The loss of 24 trees was the direct result of damage to the trees caused by the southern pine beetle. The presence of the 24 destroyed pine trees had enhanced the value of the petitioners' property immediately before their destruction. The petitioners spent $300 in 1962 in order to have the 24 dead trees removed. The petitioners' adjusted basis in the entire property immediately before the loss of the 24 pine trees was in excess of $9,402. The southern pine beetle is an inconspicuous insect, brown to black in color and somewhat smaller than a grain of rice. It is a flying insect which is likely to attack pine trees, including the loblolly pine, and particularly trees damaged by lightning or weakened by storm. When the female beetle bores in to a tree and enters the cambium tissue beneath the bark, she emits an attractant which leads other beetles to the *267 tree and results in a mass attack. The beetles construct tunnels in the cambium tissue and deposit their eggs. These tunnels intersect and in a short time completely girdle the tree. This cuts off the food supply to the higher parts of the tree and kills the tree. The first evidence that a southern pine tree has been attacked by these beetles is the presence of numerous dime-sized pitch tubes on the trunk or reddish boring dust lodged in the bark crevices and around the base of the tree. After the tree dies the crown or upper area turns yellow or brown. The girdling of the tree by egg tunnels has substantially the same effect as chopping a ring around the tree with an axe. The tree is dead within five to ten days after a mass attack of the beetles. The change in color of the crown would be noticeable about two weeks after the mass attack. The Forest Service of the Department of Agriculture has issued a leaflet concerning the Southern Pine Beetle (Forest Pest Leaflet 49, Revised March 1966). This states, in part: The southern pine beetle (Dendroctonus frontalis Zimm.) is one of the most destructive insect enemies of pine in southern United States and Central America. During *268 major outbreaks, which occur periodically, it kills large quantities of timber from Maryland to Texas and from Mexico to Honduras. Since 1948 outbreaks have been common throughout most Southern States, killing over a billion board feet of pine. * * * The underlying causes of southern pine beetle outbreaks are not fully understood. It appears likely that they are caused by conditions that favor an increase in the vigor and size of beetle populations and are unfavorable for host trees. Drought, overstocked stands, absence of natural enemies, stand disturbances, and similar conditions may be involved. HOSTS The beetle attacks all yellow pines; and also white pine, spruce pine, red pine, and red spruce. Attack is frequently unsuccessful on white pine, usually because of heavy exudation of pitch. When beetles attack red spruce they excavate short tunnels and soon die. Shortleaf, loblolly, Virginia, and pitch pines appear to be preferred to slash and longleaf. EVIDENCE OF ATTACK The presence of a southern pine beetle outbreak is usually indicated by discoloration of the crowns of infested trees. Discoloration begins with the yellowing of needles in the upper crown, and progresses *269 rather rapidly over the whole crown, with the fading needles soon turning to a reddish brown. Usually large groups of trees are affected; seldom as few as one or two (fig. 2). Examination of the trunks of the discolored trees reveals small yellowish-white masses of pitch called "pitch tubes," one-fourth to onehalf inch in diameter. These pitch tubes mark the points of beetle attack. In unusually dry weather, however, there may be no pitch, or only mere traces of it, under bark scales where the beetle bored into the tree. When this occurs, the only evidence of attack may be reddish-brown boring dust lodged in bark crevices and in cobwebs on the trunks, or at the base of the tree. Removal of a piece of the bark from an infested pine will reveal an array of winding galleries on the inner bark and on the wood surface, a characteristic which clearly distinguishes the presence of the southern pine beetle from any other pine bark beetle in the South (fig. 3). If the attack is recent, there may be some adults in the egg galleries or very tiny, whitish larvae near the galleries. In older attacks, most of the brood will be within the bark. * * * LIFE HISTORY The insect overwinters in the *270 bark in the egg, larval, pupal, and adult stages. In the U.S. beetles of overwintering broods begin to emerge and attack trees in the spring (April-May) about the time 160 dogwood is in full bloom. The life cycle from egg to adult requires 30 to 40 days; 4 to 6 generations are produced a year (up to 7 in Honduras) with some overlapping. Beetle populations and activity generally reach a peak in late summer and early fall. Activity usually ceases by November; however, beetle flights and attacks do occur in winter during prolonged warm spells, even at higher elevations in the mountains. The number of beetles may increase as much as tenfold in a single season. HABITS Southern pine beetles usually attack the midtrunk of a tree first, then "fill in" both upward and downward. While larger trees are more commonly attacked, trees as small as 2 inches in diameter also may be infested. When beetles attack they bore through the bark to the wood where they then excavate long winding galleries in the inner bark. Eggs are laid in niches about one-half inch apart along the sides of the gallery. Newly hatched larvae mine in the phloem or soft inner bark for about one-half inch. Older larvae *271 mine outward into the corky bark. In about 4 weeks the larvae stop feeding and excavate cells near the bark surface in which they pupate. Pupation is completed in about 1 week at which time the adult beetle bores to the bark surface and emerges. Bark from which beetles have emerged appears as if hit by bird shot (fig. 5). * * * A report of the U.S. Forest Service, dated November 1962 (Report No. 62-123) entitled "Biological Evaluation, Southern Pine Beetle Infestations, Dickson [sic], Texas," describes a survey made by the Service in conjunction with the Texas Forest Service in August 1962 of southern pine beetle infestations in "Dickinson, Galveston County, Texas." The report stated, in part: There is no history of the insect on the area concerned. The area is south of the present southern pine beetle epidemic in southeast Texas, where the Texas Forest Service has been conducting a control project in cooperation with private landowners and the U.S. Forest Service for the past 4 years. Technical Information Causal agent - The subject causal agent is the southern pine beetle, Dendroctonus frontalis Zimmerman. Host trees attacked - The primary host in this area is loblolly *272 pine, Pinus, taeda L. Type of damage - Damage caused by the southern pine beetle is tree mortality resulting from adult beetles feeding and constructing egg galleries in the cambial region of the host and subsequently girdling the tree. Biological data - 1. Entomophagous insects found in association with the southern pine beetle in infested areas to the north were not common to this area. However, a species of mite was found in the beetle galleries of a number of trees examined. The loss of timber figured on this basis was estimated to be in excess of $22.5 million over 7.5 thousand acres. No woodusing industries are dependent on this timber. Impact of control on other resources - It is not expected that other resources will be endangered by control measures involved. However, when spraying infested trees on home sites, benzenehexachloride (BHC) should be mixed with water rather than oil because of the phytotoxic effect that oil has on grass and shrubbery. Recommendations It is recommended that no large-scale control program be initiated due to the low level of southern pine beetle activity and the coming of cooler weather. It is recommended that persons with insect *273 infestations on their property be encouraged to cut and spray all Ips and southern pine beetle infested trees. This would assist in removing the potential for another outbreak should conditions again become favorable for an increase in the beetle populations. On their income tax return for 1962 petitioners claimed a casualty loss deduction of $9,402 resulting from January freeze and July pine bark beetles computed as follows: Decrease in value
$9,000
Pot plants lost in freeze
60
Cost of chemical spraying for beetles
42
Cost of removing and burning trees 300
Total
$9,402
The petitioners sustained a loss by casualty within the meaning of section 165 (c)(3) by reason of the death of 24 pine trees killed by southern pine beetles in 1962. The amount of the loss so sustained was $1,000 plus $300 paid to remove dead trees. Opinion Respondent disallowed $8,617 of the casualty loss of $9,402 claimed on the petitioners' return for 1962, explaining that it is determined that "the portion of the 161 deduction claimed by you as a casualty loss which was attributable to the damage caused by the southern pine beetle is not allowable for the reasons that such *274 loss does not constitute a casualty loss within the meaning of section 165(c)(3) nor has the amount of such loss been established." In this determination respondent allowed a loss of $785 claimed as a result of a severe freeze in January 1962. It is agreed that petitioners lost 24 of their 48 pine trees of the loblolly species located on their residence property, that the presence of the 24 destroyed trees enhanced the value of the property immediately before their destruction, that the loss was the direct result of damage to the trees caused by the southern pine beetle and that the petitioners spent $300 in 1962 in order to have the 24 dead trees removed. Petitioners contend that such loss arose from a "casualty" within the meaning of section 165(c)(3), Internal Revenue Code of 1954. [1]
*275 The expression "other casualty" as used in section 165(c)(3) refers to casualties similar in nature to fire, storm, or shipwreck, applying the rule of ejusdem generis. Respondent contends that the term "other casualty" refers to causal events which are sudden, violent, and unexpected, and not to ordinary occurrences of nature such as the action of a beetle in constructing egg galleries in the cambium layer of a loblolly pine tree. Respondent cites Burns v. United States, 174 F. Supp. 203 (D.C. Ohio, 1959), affd. per curiam 284 F. 2d 436 (C.A. 6, 1960), holding that the loss of an elm tree afflicted with Dutch Elm disease was not a loss by casualty under section 23(e)(3), Internal Revenue Code of 1939. This disease is a fungus spread by a beetle and infects the tree when the beetle bores into it. The court expressed the view that "loss occasioned by disease, however contracted, is not a casualty within the meaning of the statute." P. 210. Respondent also cites Appleman v. United States, 338 F. 2d 729 (C.A. 7, 1964), holding that a loss sustained from depreciation in value of property due to the death of elm trees from phloem necrosis *276 was not a loss due to casualty within the meaning of section 165(c)(3). The disabling agent is a virus which enters the cells of the phloem of a tree, the woody connective tissue beneath the bark. It is carried by the leaf hopper, an insect, which transmits the virus from an infected tree to a healthy one. The court observed: But the record also discloses that the taxpayers' expert witnesses testified that from the early 1950's the serious nature of the disease was obvious to any person living in the area; that during the years 1956, 1957 and 1958 the infection of elm trees was an ordinary and usual event - a common experience - in Champaign County, the situs of the property involved and where the taxpayers resided. One of the taxpayers testified that it was common knowledge a disease was attacking the elm trees throughout Champaign County in the 1950's and that the disease had been the subject of a town meeting discussion before the taxpayers took up residence upon the tract involved. Taxpayers' contention that if a definite economic loss occurs to the individual as a result of forces beyond his control, and not due to his fault, a casualty such as contemplated by Congress has *277 occurred overlooks the factor of "unexpectedness" - a prerequisite element implied in the statute - which arises from the limitation upon the scope of the phrase "other casualty" by reason of its association with fire, storm and shipwreck losses. The record demonstrates that during the years involved loss of elm trees from phloem necrosis was to be expected. It was a common occurrence. Between fifteen and seventeen thousand elms were lost in the area - over ninety-eight percent of the elms in the community. The disease existed in the area and the evidence is that no practical means existed to effectively protect a tree from infection. Thus, apart from the question whether death within a month from infection is relatively "sudden" it is apparent the element of unexpectedness was entirely lacking, and as a matter of law the death of the taxpayers' elms during 1956, 1957 and 1958 was not a casualty within the meaning of section 165(c)(3). The District Court erred in denying the government's motion for judgment notwithstanding the verdict. The judgment order of the District Court is therefore reversed. 162 The courts have considered a number of cases in which casualty losses were *278 claimed for extensive damage to property by termites. In some the claims were rejected on the ground that the loss was not sudden, or that this form of destruction was not a casualty. [2] In a few cases the claimed loss was allowed where the evidence showed that the invasion of termites came soon after an inspection which indicated that none were present. [3] For a discussion of some of these cases see Leslie C. Dodge, 25 T.C. 1022 (1956), disallowing a claimed loss, and E. G. Kilroe, 32 T.C. 1304 (1959), allowing a loss where damage was found soon after an inspection showed no exterior evidence of infestation.
Respondent, in Rev. Rul. 59-277, C.B. 1959-2, 73, took the position that termite claims *279 were allowable provided the requisite degree of suddenness was shown by the evidence. Respondent reconsidered this ruling and revoked it in Rev. Rul. 63-232, C.B. 1963-2, 97. As stated in the latter ruling, the present position of the Internal Revenue Service is that "damage caused by termites to property not connected with the trade or business does not constitute an allowable deduction as a casualty loss within the meaning of section 165(c)(3) of the Code." This was based upon scientific data to the effect that extensive structural damage caused by termites would require at least one year after initial infestation, even under extreme conditions. Respondent argues that infestation of petitioners' pine trees was a usual and expected occurrence, and that the southern pine beetles were present in large numbers in East Texas from 1957 through 1962 and later years. The testimony concerning the presence of beetles in the Dickinson area is to the effect that there were no known attacks in epidemic proportions in that area prior to or subsequent to 1962. In E.G. Kilroe, supra, we held that a loss due to damage by termites which apparently occurred between *280 an inspection in January and the discovery of termite channels in April had the necessary degree of suddenness to qualify as a loss by casualty. The evidence herein is that a mass attack by southern pine beetles on a loblolly pine tree will kill a tree within 5 to 10 days. This is far more sudden than the damage shown in any of the termite cases. Nor is the beetle damage a disease, as in cases of Dutch Elm disease or phloem necrosis. The epidemic which occurred in 1962 was unexpected in the Dickinson area. While the attack is an occurrence of nature and many trees are killed in this way every year, still it is unexpected by property owners such as the petitioners that their particular property may be attacked. In our opinion the loss of 24 pine trees by the petitioners in the short period of time in the summer of 1962 and as a result of the attack by beetles was a loss by casualty within the intent of section 165(c)(3). We next consider the computation of the loss. The measure of a casualty loss is the fair market value of the property immediately before the casualty, reduced by the fair *281 market value immediately after the casualty, but not exceeding the adjusted basis. Income Tax Regs., section 1.165-7(b). Petitioners attached to their return a written appraisal by Earl M. Stafford, a Texas City licensed real estate broker, expressing an opinion of the loss sustained by the petitioners from an extensive freeze in January 1962 and an onslaught of beetles upon the pine trees in the area including the petitioners' property. The appraisal stated: In relation to subject property, 24 of 48 yellow pines, of 4inch to 18inch caliper - a few up to 24inch - were killed on subject property. Thousands of pine trees on the Ervine-Bishop Tract to the east - virtual complete destruction - died in July, 1962. Value of this contiguous property, to subject property, lay in the magnificent view and canopy of trees that flourished on the Ervine-Bishop Tract. Loss in value to subject is contributed by these factors: A. The once beautiful view and forested canopy is replaced by towering gaunt skeletons. B. Since no control measures have been taken on the Ervine-Bishop Tract, it is a potential source of reinfestation. C. The crowded dead trees on the *282 E/B Tract present a tremendous fire hazard 163 to subject property. This point would deter an intelligent buyer and reduce value. Escape would be difficult if a fire should be set by lightning or other means. This appraiser knows of no recognized method to appraise value of native trees, unless they have value as commercial lumber, except the concept of "before and after" valuations, considering the difference to be the contribution of the trees to the property value. This appraiser, however, recognizes the value of expert opinion of losses established on perennial trees and shrubs commonly purchased from nurseries, as their value is established, on the loss from the freeze, in the market place. Market Value in Jnauary 1962, before the freeze is estimated as follows: House: 2000 sq. ft. @ $9, less 20% depreciation
$14,400
Garage: 1200 sq. ft. @ $4, less 20% depreciation
3,840
Contribution of patio, pool, and fence 3,200
Total Value of Improvements.
$21,440
Add Land - 4 acres @ $6,000 24,000
Total
$45,440
ROUNDED TO $45,000.00 Market Value in August 1962 (and in April 1963) after the "Pine Beetle" Invasion: Due to loss of perennials, 24 native *283 pines on subject property, destruction of view and its replacement by a fire hazard, it is this appraiser's judgment that value has been reduced 20%, or $9,000, thus expressing a market value for August 1962 (and April 1963) of $36,000. This loss is intended to include the "freeze" catastrophe as itemized by L.R. Gripon of Lynn's Nursery on the attached exhibit, amounting to $785.00. Additionally owners of subject property have spent money to control "Pine Bark Beetles" on their own property, as well as remove the 24 dead trees. This estimated expense of $350 is not included in this real property estimate. The principal decline in value lies in the loss of view, creation of a source of potential reinfestation, and the fire hazard on the adjacent Ervine-Bishop Tract. As this area is unincorporated and E/B ownership is absentee, there exists no municipal ordinance or authority to enforce removal of dead timber; also no inclination on the part of the owner to voluntarily remove the dead timber. Thus this hazard may be considered long-term. And 100 years would grow another comparable view. Petitioners introduced testimony of a real estate broker, W. R. Brady, of Dickinson, who *284 had examined and appraised their property subsequent to the loss of the trees. He was familia: with the circumstances of the infestation of southern pine beetles in the general area in 1962. He appraised the petitioners' property at $55,000 before, and $47,000, after, the loss of 24 pine trees. He did not take into consideration the factors relating to the adjacent tract such as fire hazard from the presence of dead trees or the possibility of further infestation from that property. He based his appraisal upon the difference in value between wooded and unwooded land, which he considered as approximately $2,000 per acre, and assumed that petitioners' land was approximately four acres in extent. Upon cross-examination he appeared to be unacquainted with the fact that 24 of petitioners 48 pine trees were not destroyed. [4]
*285 The appraisal by Earl M. Stafford which was attached to the petitioners' return estimated a loss of about $9,000. This included a loss of shrubbery due to a freeze in the amount of $785 which respondent has allowed. This appraisal considered the loss from the beetle infestation as principally due to loss of view due to death of trees on neighboring property, and creation of a fire hazard and source of potential reinfestation from the neighboring Ervine-Bishop tract. In Citizens Bank of Weston, 28 T. C. 717 (1957), affd. 252 F. 2d 425 (C.A. 4, 1958), the taxpayer claimed a loss of value of its premises from flood although no physical damage had resulted, the claim being on the ground that the utility of the bank's basement for record storage was impaired by the possibility of another flood. We rejected this argument and agreed with the respondent that 164 physical damage or destruction of property was an inherent prerequisite in showing a casualty loss. Hence, to the extent the loss to the petitioners here was in the nature of impairment of the view or potential danger from fire or reinfestation because of the damage to adjacent property, it is not *286 the kind of a loss which could qualify as deductible. See also West v. United States, 163 F. Supp. 739 (E.D Pa., 1958), affd. 259 F. 2d 704 (C.A. 3, 1958). The respondent argues that the Stafford appraisal, basing the loss on what happened on the adjacent property, contradicts the Brady appraisal, basing the loss on comparisons with nearby wooded and unwooded land, and that therefore petitioners have not proved the amount of their loss. It is obvious that the petitioners sustained some loss. Although the evidence of the amount of impairment in value is far from satisfactory, there is not a total failure of proof requiring us to deny any deduction. We are not satisfied, however, that the amount of the loss caused by the beetle infestation on petitioners' property was anything like the amounts estimated by petitioners' witnesses. One based his estimate principally upon "the loss of view, creation of a source of potential reinfestation, and the fire hazard" caused by the infestation of adjacent property. These are not factors which are to be taken into account in appraising the physical damage to petitioners' property. Citizens Bank of Weston, supra. *287 The other witness based his estimate upon a comparison of values between wooded and unwooded properties notwithstanding only 24 of a total of 48 pine trees on petitioners' property were destroyed, and there is evidence there were trees of other varieties on the property which were not affected by the pine beetles. Also it is unclear whether the witnesses were evaluating the damage to four acres or six acres. Using our best judgment, and applying the principles of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), we find that, in addition to the conceded loss of $785 from freezing, and $300 paid to remove dead trees, cf. Bessie Knapp, 23 T.C. 716, 721 (1955), petitioners sustained a loss by casualty in 1962 as a result of the southern pine beetle attack in the amount of $1,000. Decision will be entered under Rule 50. Footnotes
1. SEC. 165. LOSSES. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck or other casualty, or from theft. * * *↩
2. Charles J. Fay, 42 B.T.A. 206 (1940), affd. 120 F. 2d 253 (C.A. 2, 1941); United States v. Rogers, 120 F. 2d 244↩ (C.A. 9, 1941).
3. Rosenberg v. Commissioner, 198 F. 2d 46 (C.A. 8, 1952), reversing 16 T.C. 1360 (1951); Shopmaker v. United States, 119 F. Supp. 705 (D.C. Mo., 1953); Buist v. United States, 164 F. Supp. 218↩ (D.C.S.C., 1958).
4. Q. Are you familiar with the fact the Nelsons did have twenty-four of their forty-eight pines still standing after the attack? A. At the time of this infestation? Q. After the infestation. A. Well, I particularly pinpoint in it that I remember two particular large trees that we pointed out - THE COURT: Are you familiar with the fact that twenty-four of the trees on the Nelson's property were not infested or destroyed? THE WITNESS: Were not destroyed? No. I am not. I don't believe there is that many left on the property. Is there?↩